## GABRIELLE STIEGLER *vs.* EUREKA LIFE INSURANCE COMPANY.

*Life Insurance—Fraud in Procurement—Provision in Policy— Incontestability After Time Named—Cancellation by Insurer—Sufficiency of Notice—Return of Premiums—Delivery of Letter—Presumption—Error in Address—Evidence—Instructions—Bills of Exception—Delay in Signing—Estoppel to Assert.*

The question of the good faith of an applicant for life insurance, or of the materiality of the representations in the application, is generally a question for the jury, not to be withdrawn from their consideration if the evidence on the point is con-

flicting or doubtful, though, if. the applicant's fraud, or the falsity and materiality of the representation, is shown by clear, convincing, and uncontradicted evidence, the court may so rule as a matter of law.                                              p. 637

The fact that the agent of the insurer co-operated in the fraud of the applicant for a policy is immaterial, it not being within the scope of the agent's authority deliberately to deceive and mislead his principal by confederating with the assured, where truth is vital to prevent the perpetration of a fraud on his principal.                                      p. 638

There can be no recovery on a policy procured by the fraud of the applicant with the connivance of the agent of the insured, unless the insurer has otherwise agreed, or has otherwise lost its defense through a waiver or an estoppel.      p. 638

A life insurance policy may establish a reasonable period of limitation, such as one or more years, within which the insurer must discover and assert any such defense as may exist to the policy, even if this be fraud on the part of the insured and the insurer's agents.                            p. 638

A contract induced by fraud is not void but voidable, at the election of the party defrauded.                         p. 639

A provision, in an insurance policy which was procured by fraud, making it incontestable after one year from its date of issue, did not limit the insurer to a defense at law of fraud, if a loss occurred within the year and an action were brought thereon, or to a proceeding in equity, within the year, to cancel the policy, it being sufficient that the insurer communicated to the insured, within the year, its election to rescind the policy.
pp. 639-641

The communication to the other party of the insurer's election to rescind may be through litigation or by some definite or conclusive word or act, the first method being by a proceeding in equity to have the contract judicially declared at an end, or by defence taken on the rescission, if there be a suit on the contract within the year allowed for contest, while if the rescission is not declared in judicial proceedings, the word or act giving notice must be prompt, clear, decisive, and sufficient to manifest the election to rescind.                    pp. 641, 642.

The policy of insurance containing no clause permitting cancellation by either party, the method of communicating a rescission for some legally sufficient cause, such as fraud, deceit, or misrepresentation, is according to the practice at common law.                                                               p. 642

In case of fraud in the procurement of a policy of insurance, the injured party must proceed, without unreasonable delay after discovery of the fraud, to rescind the contract and to manifest its determination to the other party, delay, after the discovery of the fraud, although within the period allowed by the policy for contest, furnishing evidence of the insurer's decision to affirm the contract, and its failure to communicate its election to rescind within that period terminating its right of election.                                                         pp. 642, 643

The communication by the insurer to the insured of its election to rescind for fraud must be accompanied by restitution or an offer of restitution, as far as possible.              p. 643

The failure of the insurer to return, or offer to return, the premiums received by it prior to the asserted election to rescind, is evidence of its conclusion to continue the contract, and will, as a general rule, justify the court in holding as a matter of law that the insurer has not proved its election to terminate.                               °                        p. 643

To effect a rescission, the contract must be rescinded in its entirety, and it cannot be affirmed in part and rejected in part.
                                                            p. 643

An election to rescind must become operative in the present and not in the future.                                  p. 644

Where the policy was by its terms incontestable after the period of one year from the date of its issue, a communication by the insurer to the insured to the effect that the policy would be cancelled as of a subsequent date named, one year after the date of its issuance, by reason of the withholding of certain information in insurer's application, and that no further premiums would be accepted thereon, without at the time returning or offering to return the premium previously received, was not sufficient as an election to rescind the policy for fraud, the communication in effect recognizing the validity of the contract for the period of one year.                            pp. 644-647

That a letter, sufficiently prepaid in stamps, was correctly addressed and then mailed, is evidence that the letter was duly delivered to the addressee.                                    p. 647

The address of a letter: "Dr. A. Stiegler, U. S. Piece Dye Works, Hawthorne, N. J.," was not sufficiently accurate to make its mailing evidence of its actual delivery, when the intended addressee was Alfred Stiegler, who lived in Paterson, six miles distant from Hawthorne, in which latter place he was employed by the United Piece Dye Works.                p. 647

That the letter was in the hands of the intended addressee on a certain date did not justify the inference that it was received by him at an earlier date.                              p. 648

That a letter addressed to the head of a mill was delivered at the mill on a certain date did not show that the addressee received it on that date, he being at the time ill in bed at his residence in another city six miles away, there being no evidence of a custom or business habit of forwarding his mail to him, other than the testimony of another employee, not shown to have had charge of the receipt or distribution of the mail, that the mail was carried daily to the addressee's home, and the stenographer who was said to carry the mail not being produced as a witness, nor her absence accounted for.

pp. 648, 649

There being no legally sufficient evidence from which the jury could find either that due notice of rescission by the insurer was given to the insured within the year during which the policy was contestable, or that the assured and the insurer's agent did not unite in the deceit practiced on the insurer, it was error to submit those questions to the jury.            p. 650

A prayer should not submit to the jury the question "when due proof" of death was furnished the insurer, it being for the court to say whether the proof of death furnished was due proof.                                                  p. 650

A prayer instructing the jury that, in case of a verdict in favor of plaintiff, they should include interest at the rate of six per cent. per annum from such date as they should find that due proof of death was delivered at the home office, was defective as leaving to the jury the question whether the proof furnished was "due proof," this being for the court.       p. 650

The prayer was also objectionable as not containing or indicating the date from which interest ran under the policy, there being no reason to take the allowance of interest out of the usual rule.                                p. 650

In an action on a policy of insurance, the exclusion of a letter from one of plaintiff's attorneys to the defendant, stating argumentatively the writer's reasons for the validity of the claim, was proper.                            p. 650

A letter by the defendant's attorney in reply to the demand for payment of the policy, stating that the insurance company had, by a certain letter, cancelled the policy as of a named date, that the policy was not in force at the time of the insured's death, and that it would be useless to forward proof of death, *held* admissible.                            p. 651

In an action on a life insurance policy, declarations made by the assured to a surgeon, as to the condition of his health before the insurance, indicating that the answers in his application were false in denying that he had had a certain disease, being against the interest of the assured in a material matter, were admissible.                              p. 651

The mere correspondence in name is not sufficient to show that an application for insurance, refused by another company, was made by the assured under the policy in suit.        p. 651

A notice from the insurer of an intention to rescind the policy in the future, as distinct from notice of a rescission made, is not effectual for the purpose of cancellation.    p. 652

On an issue as to the time of receipt of a letter, sent from Baltimore, the assistant superintendent of mails there could testify as to the due course of the mail between that city and the city to which the letter was addressed.            p. 652

An expert's opinion is unnecessary on the question whether the misdirecting of a letter, or the sending thereof to the name of a non-existent concern, would cause delay in its delivery.
                                            p. 652

On an issue as to false statements made by the assured in his application for the policy, evidence as to his reputation for integrity and character is inadmissible.            p. 652

Testimony by officials of the defendant company, to the effect that if the assured had stated in his application that he had been rejected by other companies, or that he had had a certain disease, the defendant would not have written the policy, were admissible for the purpose of establishing that his false representations in these respects were material to the risk.

p. 652

That questions asked of officials of defendant insurance company were based on the assumption that the assured had been rejected by three other companies, which was not correct as regards the number of rejections, *held* harmless, the answers being based on the sufficiency of a single objection.          p. 653

The evidence of the chief medical examiner of the insurer, that he had recommended the issuance of the policy to the assured on the faith of the statements made in the latter's application, was admissible as reflecting on the materiality of the false representations contained therein in the procurement of the policy.                    p. 653

The testimony of a handwriting expert as to who wrote the false answers in the application for insurance was properly excluded, the assured having signed and delivered the application, and received a duplicate original attached to the policy, and it being consequently immaterial who wrote the answers.

p. 654

Under Acts 1916, ch. 625, extending the time for signing bills of exception in the courts of Baltimore City "until ten days before the period within which" the record must be transmitted to the Court of Appeals, the ten days are to be counted from, and exclusive of, the last day of the period for transmission of the record, and the tenth or final day of the series is the last day on which the bills of exception may be signed.

pp. 655, 656

Accordingly, where the appeal was taken February 25th, and the end of the three months' period within which the record could be transmitted was consequently May 25th, the last day for signing the bills of exception was May 15th.          p. 656

Where a particular time is given, from a certain date, within which an act is to be done, the day of the date is to be excluded, but not both terminal days, unless this is clearly indicated.

p. 656

That the last day of the period, allowed by statute for the signing of bills of exceptions, fell on Sunday, is not ground for extending the period until Monday.                          p. 656

The provision of Acts 1916, ch. 625, that the bills of exception shall be submitted to the appellee or his counsel "not less than thirty days" prior to the time within which the record must be filed in the Court of Appeals, means thirty clear days, exclusive of both terminal days.                          p. 657

The provision of Acts 1916, ch. 625, as to the submission of the bills of exception to the appellee or his counsel for amendments or additions, and the subsequent provisions, are directory and not mandatory, and a failure to comply therewith does not affect the consideration of the exceptions on appeal, if the bills of exception are actually signed in time.                          p. 657

It appearing that, on the last day of the statutory period, appellant's counsel undertook to examine the bills of exception as prepared by appellee's counsel, but, owing to his engagements in court, was unable to complete his examination on that day, and the two counsel then agreed to meet the next day in order to settle them finally, without anything being said by appellee's counsel to indicate his objection to such postponement, and that on the next day he objected only after he had approved them as prepared, *held* that appellee was estopped to assert that he did not consent to the postponement.    pp. 658, 659

*Decided January 13th, 1925.*

Appeal from the Superior Court of Baltimore City (CAR-ROLL T. BOND, J.).

Action by Gabrielle Stiegler against The Eureka Life Insurance Company of Baltimore. From a judgment for defendant, plaintiff appeals. Reversed.

The cause was argued before PATTISON, ADKINS, OFFUTT, DIGGES, and PARKE, JJ.

*J. Kemp Bartlett* and *J. Kemp Bartlett, Jr.,* with whom were *Bartlett, Poe & Claggett* on the brief, for the appellant.

*W. Calvin Chesnut,* with whom was *Jacob S. New* on the brief, for the appellee.

PARKE, J., delivered the opinion of the Court.

Alfred Stiegler was a doctor of chemistry in the employ of the United Piece Dye Works, an industry for dyeing silk at Hawthorne, near Patterson, New Jersey. On January 14th, 1921, the Eureka Life Insurance Company, appellee, issued a policy of insurance for $5,000 on his life, payable at death to his wife, Gabrielle Stiegler, the appellant. The insurance policy was granted in consideration (a) of a written application, which was signed by the assured and made a part of the policy; and (b) of the payment in advance, on delivery, of the first annual premium. The policy provided, however, that, in the absence of fraud, all the statements made by the assured should be representations and not warranties, and that no such statements should void the policy or be used in defence of a claim under the policy, unless it be embraced in the application whose copy should be attached to the policy when issued.

The application was signed by the assured as of November 29th, 1920, and a copy thereof was duly attached to the policy bearing date of January 14th, 1921, and the first premium was paid on February 12th, 1921. The policy was then in full force and effect, counting from January 14th, 1921.

. The application required the person seeking insurance (a) to state if he had ever applied to any company, order or association without receiving insurance in the amount, or on the plan applied for, or at his actual age, or at the proper premium therefor, (b) and, if so, to give the particulars; (c) and to say if he had ever applied or negotiated, signed an application, or undergone a medical examination for insurance with any company, order or association other than is covered by his former answers already recorded, and, if yes, to give particulars. These questions were printed, and space was allotted for the appropriate answers. In a bracket directly opposite the place for the signature of the assured was this plain statement:

"And it is further declared and agreed that the fore-
going statements and answers and also the statements
and answers to the medical examiner are correct and
wholly true, and that they shall form the basis of the
contract of insurance if one be issued."

The materiality of the answers to these questions was
·affirmatively determined by the stipulation of the policy and
by this agreement contained in the application; and the
·extrinsic evidence on this record, also, made it indisputable
that these inquiries and their written replies were material
representations by the applicant for insurance. It is further-
more beyond controversy that, before making his application
for the insurance with the appellee, the assured had applied
for other insurance, and thereupon had undergone a medical
examination, and thereafter had been refused insurance, and,
in one instance, his advance payment of one hundred dollars
on account of his premium had been returned to him on De-
cember 1st, 1919, because of his rejection as an insurable
risk.   Notwithstanding these facts, the proof is conclusive
·that the assured, in corrupt and fraudulent combination with
the soliciting agent of the insurance company, deliberately
·denied his former application for life insurance in another
company, his medical examination, and his failure to secure
insurance, by answering "no" to the questions put, with full
knowledge of the falsity of his answers, and with the express
.and declared purpose of deceiving the insurance company, so
as to procure the insurance sought.

The question of the bad faith of the applicant or of the
falsity and materiality of the representations contained in
the application for a life insurance policy is generally a
question for the finding of the jury, that will not be with-
drawn from their consideration if the evidence on the point is
·conflicting or doubtful, but, if the fraud of the applicant or
the falsity and materiality of the representation is shown
by clear, convincing and uncontradicted evidence, the court
may so rule as a matter of law. *Mutual Life Ins. Co.* v.
*Willey,* 133 Md. 665, 669; *Metropolitan Life Ins. Co.* v.
*Jennings,* 130 Md. 622, 625; *Aetna Life Ins. Co.* v. *Millar,*

113 Md. 686, 693; *Forwood* v. *Prudential Ins. Co.*, 117 Md. 254, 259; *Mutual Life Ins. Co.* v. *Robinson*, 115 Md. 408, 420; *Mutual Life Ins. Co.* v. *Rain*, 108 Md. 353, 355; *Mutual Life Ins. Co.* v. *Mullan*, 107 Md. 457, 460; *Dulany* v. *Fidelity & Casualty Co.*, 106 Md. 17, 38; *Banker's Life Ins. Co.* v. *Miller*, 100 Md. 1, 6; *Maryland Casualty Co.* v. *Gehrman*, 96 Md. 634, 651; *Fidelity Mutual Ins. Co.* v. *Ficklin*, 74 Md. 172, 183.

The fact that the agent of the insurance company co-operated in the fraud does not prevent the application of this principle. It was not within the scope of the agent's authority deliberately to deceive and mislead his principal by confederating with the assured to substitute falsehood where truth was vital to prevent the perpetration of a fraud on his principal. On a policy so obtained no recovery is permitted, unless the insurer has otherwise agreed, or has lost its defense through a waiver or an estoppel. *Globe Reserve Life Ins. Co.* v. *Duffy*, 76 Md. 293, 300, 301; *Forwood* v. *Prudential Ins. Co.*, 117 Md. 254, 261, 264. And see cases *supra* and *infra*.

The insurance carrier had, in fact, agreed that the policy held by Stiegler should be incontestable one year from its date of issue, except for non-payment of premium or for service in the army or navy in time of war without its written consent. The law is definitely settled by the clear weight of authority that a life insurance policy may establish a reasonable period of limitation, as one or more years, within which the insurer must discover and assert such defences to the policy as may exist, even if these be fraud on the part of the insured and the agents of the insurer. 2 *Williston, Contracts*, sec. 811, pp. 1556, 1557; 14 *Ruling Case Law*, title "Insurance," sec. 380, pp. 1199-1201; *Mutual Life Insurance Co.* v. *Hurni Packing Co.*, 263 U. S. 167, reported and annotated in 31 A. L. R., pp. 102-118. .

This case is not within any of the prescribed exceptions of the non-forfeiture clause, and the assured died beyond the term of one year from the issuance of the policy, so the con-

troversy here hinges on whether or not the insurance company effectively rescinded the contract of insurance within the allotted year of investigation and discovery.

The insurance carrier remained in ignorance of the fraud of the assured until some time during the first half of December, 1921, when, as a result of an investigation begun in June or July, 1921, the insurer had enough information to justify it in terminating the contract of insurance.

The discovery of this fraud was within the period of one year from the date of the issuance of the policy and its incontestable clause had, therefore, not become effective. It was, accordingly, the privilege of the insurer to affirm the contract, or, at its option, rescind the contract, as a contract induced by fraud is not void but voidable, at the election of the party defrauded. *Rawlins* v. *Wickham* (1853), 3 DeG. & J. 304, 322, 28 L. J. Ch. 188, and *infra.*

It has been urged by the appellant that the true interpretation of the non-forfeiture clause of the policy, on which this action is brought, limited the insurance carrier to a defence at law of fraud, if a loss occurred within the year and an action were brought thereon, or to a proceeding in equity, within the year, to cancel the policy.

It is true that this contention of the appellant is supported by cases which have adopted the view of the Supreme Court of North Carolina in *Amer. Trust Company* v. *Insurance Company,* 173 N. C. 558. See *Mut. Life Insurance Company* v. *Buford,* 61 Okla. 158; *Ramsey* v. *Insurance Company,* 297 Ill. 592; *Ebner* v. *Insurance Company,* 69 Ind. App. 32, 121 N. E. 315; *Insurance Company* v. *McIntyre,* 294 Fed. 886; *Insurance Co.* v. *Pickering,* 293 Fed. 496. The Supreme Court of North Carolina rested its conclusion on this statement of its view of the law: "It follows, therefore, that the conduct of the defendant in notifying the insured that it would cancel the policy and in tendering the first premium which he had paid, did not rescind or cancel the contract, as the plaintiff did not consent thereto, and amounted to no more than a breach, and that the remedy of

the defendant was to institute an action for cancellation within the year, and as it did not do so, the policy was in force at the expiration of the year." *Supra,* p. 567.

This Court is unable to agree that the rescission of a contract procured by deceit in a material matter cannot be effected on its discovery by the defrauded party except through litigation, unless the defrauded party obtain the consent of the wrongdoer. The doctrine of rescission does not depend upon such an illusory and unstable basis as the concurrence of the defrauding party, but is the personal right of the victim of the fraud to be exercised or not of his own independent volition. A proceeding at law or in equity to enforce the rescission of a contract is not of itself a rescission but is the result of a precedent act or election to rescind, and is a method of communicating that fact to the defendant. Nor can the Court accept the other ground, which was further assigned for the conclusion, that the exercise of the right, at common law and in equity, of a defrauded party to rescind a contract obtained by a material misrepresentation is "no more than a breach" of contract. It would seem logical to hold that, if a timely notice to the assured of a rescission for fraud and an offer to return the premium, are "no more than a breach" of contract, litigation to annul the contract is simply another, but more efficacious breach.

In some of the cases, stress has been laid upon the word "incontestable." The relevant clause is: "This policy is free of conditions as to residence or travel, and shall be incontestable after one year from its date of issue." The word "incontestable" is said to refer to litigation exclusively, and, if this be conceded, it must be borne in mind that the term "incontestable" is confined in its application to the period ensuing after one year from the date of the issuance of the policy, and has no application to the preceding term of one year following the issuance of the insurance contract. There is nothing in the policy itself or in any canon of construction that would justify the extension of the application of "incontestable" beyond the limits clearly fixed by the contract itself.

Life insurance is a contract *uberrimae fidei,* and the policy is governed by the general principles of law so as to be avoided not only by fraud, but also by the concealment or misrepresentation of a material fact inducing the contract, except to the extent modified or excluded by the provisions and stipulations of the contract or by statute. There is no occasion, in a case of actual fraud, to extend by judicial construction the application of the clause providing for indefeasibility. Code, art. 23, sec. 213; 17 *Halsbury's Laws of England,* p. 344; 14 *R. C. L., "Insurance,"* sec. 380; *Anctil* v. *Manufacturers Life Ins. Co.* (1899), A. C. 604, P. C.

While fully sensible of the weight to be attached to the cases relied upon by appellant, we do not concur in their view, and it is our opinion that, under the clause in the instant case, the insurer is allowed a year within which to discover any sufficient ground for avoiding the contract, and, if cause be found and it elects to rescind the contract, the carrier has at its command every method, at common law or in equity, of communicating its election to the assured, within the year reserved for that purpose.

As was said by the Pennsylvania Supreme Court in the case of *Feierman* v. *Eureka Life Insurance Company,* 279 Pa. 507, 32 A. L. R. 646, where the period was two years: "The great weight of authority supports the position that the insurer must at least disavow liability within the contestable period, to be relieved—not necessarily by legal action, but some definite step, specifying the ground of complaint, in such form as to effect a cancellation of the contract. * * * The knowledge that false representations have been made must be ascertained within the two years, and, in the same time, the company, by some act, must rescind, cancel or notify the insured or the beneficiary that it will no longer be bound by the policy." *Mutual Life Ins. Co.* v. *Hurni Packing Co.,* 280 Fed. 18.

The method of communicating to the other party the insurer's election to rescind the contract may be through litiga-

tion or by some definite or conclusive word or act. The first method is through a proceeding in equity to have the contract judicially declared at an end or by defense taken on the rescission, if there be a suit on the contract within the period of one year. If the rescission is not declared in judicial proceedings, the word or act giving notice must be prompt, clear, decisive, and sufficient to manifest the election. It was by this third method that the appellee attempted to manifest to the assured its election to rescind, and the legal sufficiency of its words and acts is for determination, and requires a statement of the more important requisites of this third method of communication.

The policy of insurance in this case contained no clause permitting cancellation by either the insurer or the assured. It is important to bear this fact in mind, because a right conferred by the policy to cancel is exercisable at the option of the party, with or without a reason, while the right of rescission is implied and usable only when there exists some legally sufficient cause, as, for example, fraud, deceit or misrepresentation. It is, therefore, a corollary that the method of communicating a rescission is according to the practice at common law, as it is here neither regulated by the terms of the policy or by statute. *Kerr on Fraud and Mistake,* (5th Ed.) 403, 404, 409; *Wald's Pollock on Contracts* (3rd Ed.), 707, 710, 723, and *infra; Ewart, Waiver Distributed,* pp. 111, 117, 205, 212, 215; 3 *Williston, Contracts,* secs. 1525, 1527; *Reese River Silver Mine Co.* v. *Smith,* L. R. 4 H. L. 64, 73; *Clough* v. *London etc. Ry. Co.,* L. R. 7 Ex. 26, 34, 36; *Bwlch-y-Plwm Lead Mining Co.* v. *Baynes* (1867), L. R. 2 Ex. 326.

1. The injured party must proceed without unreasonable delay after the fraud is discovered to rescind the contract, and to manifest its determination to the other party. Delay, after the discovery of the fraud but within the period of one year, will furnish evidence that it had decided to affirm the contract. If the defrauded insurance carrier does not communicate the fact of its election to avoid the contract to the

assured within the period designated, its right of election is lost. *Hennessy* v. *Bacon,* 137 U. S. 78, 84; *McLean* v. *Clapp,* 141 U. S. 429, 432; *Latrobe* v. *Dietrich,* 114 Md. 8, 21, 22; *Munich Co.* v. *United Surety Co.,* 113 Md. 200, 218; *German Fire Insurance Co.* v. *Clarke,* 116 Md. 625, 626; *Nat. Union Ins. Co.* v. *Asbestos Co.,* 122 Md. 121, 124; *American Fire Ins. Co.* v. *Brooks,* 83 Md. 22, 34, 35; 3 *Williston, Contracts,* secs. 1529-1531; *Ewart, Waiver Distributed,* pp. 105, 108, 109, 117-121, 234-235, 240, 242; *Sharpley* v. *South etc. Ry.* (1876), 2 Ch. D. 685.

2.    The communication must be accompanied by restitution or an offer of restitution, as far as possible. The contract is not void but voidable and since the right of rescission is founded on equitable principles the injured party may not require the return of what has been obtained from him by deceit until he has in turn restored, or offered to restore, to the limit of possibility, what of value was received by him from the wrongdoer. The failure of the insurance carrier to return, or offer to return, the premiums received prior to the asserted election to rescind is evidence of its conclusion to continue the contract; and, as a general rule, will justify the court in holding as a matter of law that the carrier has not proved its election to terminate. *New Jersey Rubber Co.* v. *Commercial Union Assurance Co.,* 64 N. J. L. 580; *Metropolitan Life Ins. Co.* v. *Freedman,* 159 Mich. 114, 32 L. R. A. (N. S.) 298; *Automobile Ins. Exch.* v. *Wilson,* 144 Md. 249, 255; *Renshaw* v. *Lefferman,* 51 Md. 277, 284; *New York Life Ins. Co.* v. *Fletcher,* 117 U. S. 519; *Brotherhood of Railroad Trainmen* v. *Clark,* 189 Ind. 373, 18 A. L. R. 1190; 6 *Pomeroy, Equity Juris.,* sec. 688, pp. 1164-1165; *Kerr, Fraud and Mistake* (5th Ed.), 386, 387; 1 *Bacon, Insurance* (4th Ed.), secs. 361, 362; *Black, Cancellation and Rescission,* secs. 476, 483; 3 *Joyce, Insurance* (2nd Ed.), sec. 1671, p. 2835, sec. 1640a, pp. 2776-2778.

3.    Furthermore, the contract must be rescinded in its entirety. It may not be affirmed in part and rejected in part. When the choice is once made, it is conclusive, and the re-

jected alternative is precluded.  A contract cannot be valid
and void at the same time.  Accordingly, an election to
rescind must become operative in the present and not in the
future.  *German Fire Ins. Co.* v. *Clarke,* 116 Md. 626;
*American Fire Ins. Co.* v. *Brooks,* 83 Md. 34; *Munich* v.
*United Surety Co.,* 113 Md. 200, 219; *Cole* v. *Hines,* 81
Md. 476, 479-482; *Latrobe* v. *Dietrich,* 114 Md. 8, 21; *Foley*
v. *Crow,* 37 Md. 51, 62; *Dellone* v. *Hull,* 47 Md. 112, 115;
*Citizens Mutual Fire Ins. Co.* v. *Conowingo Bridge Co.,* 116
Md. 422, 438, 439; *Grymes* v. *Sanders,* 93 U. S. 55, 62;
*Kerr, Fraud and Mistake* (5th Ed.), 401, 404, 409.

The rights of the litigants in the case at bar are to be ascer-
tained by the application of these principles of law to these
comparatively few indisputable facts.

The fraud of the assured was uncovered in the first half
of December, 1921, when, as a result of an investigation
begun in June or July, 1921, the insurer had enough infor-
mation to justify it in terminating the contract of insurance.
Before the 15th of December, 1921, the proper representa-
tive of the company, at the home office in Baltimore, there
entered upon the card record of the policy "Canc. 1-14-22,"
meaning that the policy was cancelled as of January 14th,
1922, but no notice of this entry or of any intention to cancel
the policy was given or attempted to be given the assured
until about a month later.  Even then the information was
the result of an inquiry from the assured, who, not having
received a notice of the maturity of the annual premium,
wrote on January 10th, 1922, to the appellee, stating that his
premium was due on January 14th, and that he had not
received a bill, and asking that it be mailed him at once.

The company replied on January 12th by a letter which,
omitting the formal opening and ending, was in these words:
"This is to advise you that Policy No. 12039-A, issued on
your life, will be cancelled as of January 14th for the reason
that you withheld certain information governing the issuing
of this policy in your application for insurance and that no
further premiums will be accepted thereon."  The assured,

or some one for him, wrote on January 16th to the insurer acknowledging receipt of the letter of January 12th, but there is no statement in the letter as to when it was received by the assured, nor is there any direct proof as to the time of its receipt.

In his letter of January 16th, the assured disclaimed any knowledge of the nature of the charge preferred in the letter of the company, and asked for the details. The company replied on January 21st that "we found you did not answer questions 19, 19a and 20 correctly in your application for insurance, and wish to refer you to the copy of the application attached to your policy." With this letter all correspondence during the life of the assured ended, and he received no other communication of any kind, except when his representative, Francis Caminetti, was sent to Baltimore on February 11th, 1922, and made a tender, within the thirty days' period of grace that were allowed for that purpose, of the premium falling due on January 14th, 1922. On this occasion the company declined to accept the money on the ground that Dr. Stiegler had made a false statement concerning his rejection by other insurance companies. Before this visit in February of Caminetti, the insurer had made no effort, in any form, to return, or offer to return, the first and only premium it had received from the assured. The only offer was made to Caminetti and these were the circumstances.

The president of the appellee testified that the renewal department had instructions not to accept the tender of any new premiums, and to return the old premium, but he did not state when these instructions were given. The assistant treasurer and assistant secretary, A. Victor Weaver, asserted that the president instructed him "that if there were any tender of a premium in this case not to receive it, but to tender the premium back." Nothing was done, however, until Caminetti came, on February 11th, 1922, to the office of the insurance company, and made a tender of the premium falling due on January 14th, 1922, when Weaver declined

to accept the tender, and said to Caminetti, "we were ready to return the premium paid on the policy." Caminetti replied that he had not come for that purpose but to pay the premium.

After this interview in Baltimore on February 11th, nothing occurred until the death of the assured on March 27th, 1922. The beneficiary made a demand upon the appellee, which refused to pay. The material question, therefore, is, Do these facts establish a rescission of the contract at law and within the conditions of the policy? We think not, and for the reason that there was no legally sufficient evidence to establish that the appellee, within the year before the condition of the policy providing for indefeasibility became effective, rescinded the contract, with notice to the assured and with restitution or with an offer thereof.

The appellee knew of the fraud by the middle of December, and determined to cancel the policy as of the following January 14th, as is irrefutably established by its own record entry on December 14th of "Canc. 1-14-22," and its letter of January 12th to the assured advising him that the policy issued on his life "will be cancelled as of January 14th for the reason that you withheld certain information governing the issuing of this policy in your application for insurance, and that no further premiums will be accepted thereon." The policy had no term permitting a cancellation by the assured, and its sole right to avoid the policy was its option of rescission. Instead of so electing, it recognized the validity of the contract for the period of one entire year, ending on January 14th, and retained the premium paid for the insurance for that period, and then declared the contract of no effect after January 14th, 1922. In other words, if the assured had died on any day in the year ending on January 14th, 1922, the contract was valid, but if he died an hour afterwards the insurance was void. It accepted and retained its benefit under the policy to an arbitrary date of its own selection, and then attempted to invalidate the contract from that day for a fraud perpetrated in its very inception. To

approbate and reprobate is fatal to rescission. *New Jersey Rubber Co.* v. *Commercial Union Assurance Co.,* 64 N. J. L. 580, and other cases cited.

As the only communication to the assured of the insurer's purpose to rescind the policy, within the year allotted, was its letter of January 12th, which was insufficient for that purpose, it is immaterial whether or not it was received by the assured on or before January 14th, but, as the question was argued and is of practical consequence, it may be well to state the Court's position.

If it be proved that a letter which was sufficiently prepaid in stamps, was correctly addressed and then mailed, this is evidence to establish that the letter was duly delivered to the person addressed. The evidence was that such a letter, if mailed on January 12th in Baltimore, would be delivered in due course of mail at Hawthorne on January 13th. It is an indispensable condition that the letter be correctly addressed. Alfred Stiegler lived in Paterson, New Jersey, and gave to the appellee his address as 328 E. 30th Street, and this was the one entered on its card record. He was employed by the United Piece Dye Works, at Hawthorne, N. J., a city of 6,000 or 7,000 inhabitants, six miles distant from Paterson. The envelope containing the appellee's letter of January 12th was addressed to "Dr. A. Stiegler, U. S. Piece Dye Works, Hawthorne, New Jersey." There was no such concern as the "U. S. Piece Dye Works" in Hawthorne. The assured's name was Dr. Alfred Stiegler, and his employer's name was the United Piece Dye Works. The address was inaccurate and misleading, so the condition precedent to the mailing of the letter being evidence of its actual delivery on January 13th did not exist. *Equitable Life Assurance Society* v. *Frommhold,* 75 Ill. App. 43; *Phelan* v. *Northwestern Mut. Life Ins. Co.,* 113 N. Y. 147; *Manhattan Life Ins. Co.* v. *Fields* (Tex.), 26 S. W. 280; *Chicago etc. R. Co.* v. *Chickasha Nat. Bank,* 174 Fed. 923; *Henderson* v. *Carbondale Coal & Coke Co.,* 140 U. S. 25; *Bostain* v. *De Laval Co.,* 92 Md. 483, 487, 488; *Lawrence Bank* v. *Raney & Berger*

*Co,.* 77 Md. 321, 326-328; *Goodman* v. *Saperstein,* 115 Md. 678, 683.

The letter was not registered, and the assured was not in Hawthorne, and there was no direct evidence that it was ever delivered to the United Piece Dye Works, or when it was delivered to the assured. All that was certain is that the letter was in the hands of the assured in Paterson on Monday, January 16th, when he answered it. The pivotal question for determination is the *time* the assured actually got the letter. *Am. Fire Ins. Co.* v. *Brooks,* 83 Md. 22, 35; *German Fire Ins. Co.* v. *Clarke,* 116 Md. 622; *Crown Point Iron Co.* v. *Aetna Ins. Co.,* 127 N. Y. 608, 619. As was said in *Phelan* v. *Northwestern Mut. Life Ins. Co.,* 113 N. Y. 147, 151: "Nor does the fact that the notice was in possession of the assured on the 17th of January, 1883, afford any ground for inference that he received it in due course of mail, nor that it was served upon him, or received by him, at any day earlier than January 17th."

If, however, this point be passed and it be granted that the address was not so faulty as to preclude the assumption that the letter was delivered on January 13th at the United Piece Dye Works, this receipt would not be evidence of the day of the delivery to the assured, who was ill in bed at his home in Paterson, but testimony of the day of the delivery of the letter to the United Dye Works for the call of the assured. In the absence of all direct proof of the fact, the delivery to the assured of this letter by the Dye Works cannot be shown to have been made on or before January 14th through evidence of a business custom or habit of the forwarding of the assured's mail by the employer, unless it first be established by independent testimony that the delivery of the private mail of the assured to him at his home by the dye works was in the usual course of its business, and sufficiently fixed to be of probative value. 1 *Wigmore on Evidence* (2nd Ed.), sec. 95.

The only proof on this subject was that of Emil P. Landru, the production manager of the dye works. He

testified that the assured never returned to the place of business at Hawthorne after the end of December, 1921. Landru was not shown to have had charge of the receipt or distribution of the mail, but said that Dr. Stiegler, being the head of the mill at Hawthorne, received his correspondence daily and still dictated from his bed, and once a day a stenographer from the office would go to his home in Paterson with mail from the mill at Hawthorne. The carriage of the mail from Hawthorne to Paterson had not continued longer than fourteen days; it was an unusual and a special method of keeping the sick head of the mill in touch with its correspondence, and nothing was shown by any one having the duty of receiving the mail at the mill, distributing it and forwarding it to the assured, so as in any way to afford assurance that the service was regularly, invariably and systematically done. The appellee had selected its own method of communication and its own time of forwarding its notice, and so accepted all the risk of the delay and of the method of transmission. The assured was dead. The burden of proof was on the appellee to establish that he had actually received the letter of January 12th on or before January 14th, yet the stenographer who carried the mail was not produced by the appellee nor did it account for her absence, and there was no witness to prove that the letter had been left at the mill, or, if so, how and when it was started from the mill for delivery to the assured at Paterson.

Under the circumstances of this case, it is our judgment that the proof is too indefinite and uncertain to have evidential value affirmatively to establish that the assured received from his employer the letter in question on or before January 14th. *Supra,* and *Flack* v. *Green,* 3 G. & J. 474; *Bell* v. *Hagerstown Bank,* 7 G. 216; *Brailsford* v. *Williams,* 15 Md. 150, 159; *Williams* v. *Brailsford,* 25 Md. 126, 141; see 25 *A. L. R.,* pp. 13-21.

As it is our view that the policy had become indefeasible because of the failure of the insurer to rescind for the fraud within the year, it would be unnecessary to go further, if it

were not a statutory duty. So we shall proceed briefly to rule upon all the exceptions.

The first prayer of the appellee directing a verdict for the appellee was error for the principal reason that it was based on the theory that the incontestable condition of the policy was not operative. The appellant's first, second, third, fourth, fifth, sixth, seventh and eighth prayers were properly rejected. The first, second, seventh and eighth prayers did not conform to the theory on which the appellant was entitled to recover. There was no legally sufficient evidence from which the jury could find either that due notice of the rescission was given within a year to the assured or that the assured and the agent of the insurer did not unite in the deceit practiced on the appellee, so the third and fourth prayers were respectively bad for submitting those facts to the jury. The fifth prayer was defective in form and was misleading in that it ignored the one year period in which the right of rescission was to have been exercised. The sixth prayer confounded the sufficiency of the notice with the failure to return the premium received, and made the deduction that the notice was inadequate depend upon the failure to return the premium. The ninth prayer of the appellant is subject to the technical criticism that the jury is left to ascertain "when due proof of the death" was delivered to appellee at its home office. Whether or not the proof of death furnished was "due proof" was for the court. The prayer should have contained or indicated the date from which interest ran under the policy, as there was no reason to take the allowance of interest out of the usual rule. *Balto. Fire Ins. Co.* v. *Loney,* 20 Md. 20, 40; *Crook* v. *N. Y. Life Ins. Co.,* 112 Md. 268, 284; *Williams* v. *N. Y. Life Ins. Co.,* 122 Md. 141, 148.

The exclusion of the letter of one of the attorneys for the appellant stating argumentatively the reasons of the writer for the validity of the appellant's claim was not error. *Anderson* v. *Md. Casualty Co.,* 123 Md. 67, 72; *Dulaney* v. *Fidelity & Casualty Co.,* 106 Md. 17, 35. The letter offered

under the second exception is of a different nature, and should have been admitted. It was the official reply of the appellee to the demand of payment, and stated that the company had cancelled the policy as of January 14th by its letter of January 12th; that the policy was not in force at the time of death, and that it would be useless to forward proof of death. *Citizens' Ins. Co.* v. *Conowingo Co.,* 113 Md. 430, 439.

The third and fourth exceptions are to the admission of statements made to the witness, the operating surgeon, by the assured, as to the condition of the assured's health before the insurance, and indicating that his answers were false in denying in his application that he had had rheumatism. The declarations, under the policy, were against the interest of the assured in a material matter and were admissible. *Rosman* v. *Traveler's Ins. Co.,* 127 Md. 689.

The fifth, sixth, seventh, eighth, ninth, tenth, eleventh and twelfth exceptions were taken to statements of medical officers of the Traveler's Insurance Company and of the New York Life Insurance Company. As we read the trial judge's ruling, after the fifth, sixth, seventh and eighth exceptions had been taken, all of the material evidence admitted under these bills of exception was excluded, so there was no injury. The testimony admitted under the ninth and tenth exceptions was introductory and not of any significance. The assistant medical inspector of the New York Life Insurance Company, with the original file before him, testified under the eleventh exception that in the course of his employment he had declined for his company, on January 3rd, 1920, insurance on the life of Alfred Stiegler, and the twelfth exception is to the refusal of the court to grant appellant's motion to strike out a part of his further testimony, without specifically identifying the portion to be stricken out. There was nothing to identify the applicant for insurance in the New York Life Insurance Company with the assured, except the bare correspondence of name, which alone was not sufficient to admit

the testimony. *Loving* v. *Mut. Life Ins. Co.,* 140 Md. 182, 183.

The reading in evidence of the letter of January 12th was the ground of the thirteenth exception, and this was error, as it was not notice of a rescission having been made, but of an intention to do a future act. *German Fire Ins. Co.* v. *Clarke,* 116 Md. 622, 626. Its admission and the rulings on the eleventh and twelfth exceptions did the appellant no injury. The fourteenth and the eighteenth exceptions were abandoned by the appellant.

The testimony of the assistant superintendent of mails at Baltimore of the due course of the mail between Baltimore and Hawthorne was admissible, and we find, therefore, no error in the court's rulings on the fifteenth exception; nor on the sixteenth and seventeenth exceptions, which arose in the cross-examination of the witness, on his being asked, if a letter were misdirected or sent to the name of a non-existent concern, would that not cause delay in its delivery. The answer to these suppositions was so obvious that an expert's opinion was unnecessary.

By the nineteenth and thirtieth exceptions, testimony as to the reputation of the assured for integrity and character in his community was rightfully excluded by the court. *Loving* v. *Mut. Life Ins. Co.,* 140 Md. 173, 186.

The court permitted testimony to be given by the officials of the appellee tending to show that, if the assured had stated in his application either that he had been rejected as an insurable risk by other companies, or that he had had rheumatism, the appellee would not have written his policy. The objections to the admission of this testimony form the twentieth, twenty-first, twenty-second, twenty-third, twenty-fourth, twenty-fifth and twenty-sixth exceptions. This evidence was admissible for the purpose of establishing that his false representations were material to the risk to be undertaken by the insurer. *Forwood* v. *Prudential Ins. Co.,* 117 Md. 254, 263.

The chief objections to the twentieth, twenty-third, and twenty-fourth exceptions, are that the questions asked are

based upon the false assumption that the assured had been rejected by three other companies, which was not established as to number. It is true that the questions should not have indicated more rejections than had been established, but no injury resulted, as the answers were based on the sufficiency of a single rejection.

The deposition of Dr. McCoy was that the assured had informed him that he had been treated for rheumatism in 1917, and that when he came to him in January, 1922, he was then being treated for inflammatory rheumatism. The surgeon's opinion was that it had always been osteomylitis, and he spoke of the attack in Mexico as being one of "so-called rheumatism," but that did not change the fact that, according to the assured's belief, he had been suffering with rheumatism, and his attending physician in his last illness was evidently of the same opinion, until he was operated on.

The appellant's specific objection to the question asked under the twenty-first exception is that it incorrectly assumed that Stiegler had the inflammatory rheumatism in Mexico prior to 1919; and there was error in permitting the question to be so asked but no injury, as under the twenty-fifth and twenty-sixth exceptions the same question was put with respect to rheumatism, and the answer was similar to that under the twenty-first exception.

The testimony of the chief medical examiner of the insurer, that he had recommended the issuance of the policy to the assured on the faith of the statements made by him in his application, was clearly admissible as reflecting on the materiality of the false representations therein contained in the procurement of the policy. Code, art. 23, sec. 213. Therefore, the ruling under the twenty-second exception was right.

By the twenty-seventh exception Dr. Iglehart was asked if osteomyelitis could have had its incipiency two or three years before it culminated in its final result on the patient. The court permitted the answer of this question in the affirmative, on the condition that the reply was not to be considered by

the jury as affecting the question of misrepresentation by the assured as to his physical condition. With this qualification, there certainly was no injury, and it was in direct reply to the testimony of Dr. Drews, who stated for appellee that "I do not believe that it was possible that he could have suffered from osteomyelitis for a year."

An expert witness was produced by the appellant to establish that the answers of the applicant were not written by Stiegler. The refusal of the court to permit this testimony to be given constitutes the twenty-eighth and twenty-ninth exceptions. This testimony was immaterial. It did not matter who wrote the answers. The assured signed and delivered the application, and received a duplicate original attached to the policy. His insurance was granted in reliance upon the truthful answers of his signed application. *Forwood* v. *Prudential Life Ins. Co.*, 117 Md. 254, 261, 263; *Aetna Life Ins. Co.* v. *Moore*, 231 U. S. 543, 560, 58 L. Ed. 356, 367.

The appellee has filed a motion to dismiss this appeal on the ground that the bills of exceptions were not signed within the time prescribed by the terms of chapter 625 of the Acts of 1916, amending section 316 of the Revised Charter of Baltimore City. This section was again modified by chapter 338 of the Acts of 1924, but this later statute was not in effect during the period in which the present question arose, and its determination is controlled by chapter 625 of the Acts of 1916.

The judgment was entered against the appellant on January 27th, 1924, and on February 25th the order for the appeal was filed. Up to that date the bills of exceptions had not been prepared and signed, so the act itself further extended the time for signing the bills of exceptions "until ten days before the period within which it is required that the record shall be transmitted to the Court of Appeals; provided that the party appealing, or his counsel, shall submit the bills of exceptions to the appellee, or his counsel, not less than thirty days prior to the time that the record must be

filed in the Court of Appeals, for the purpose of amendments or additions to the said bills of exceptions, and the appellee, or his counsel, within fifteen days after said bills of exceptions shall have been submitted to him, shall return said bills of exceptions to the appellant, or his counsel, with such amendments or additions as he may desire. And upon his failure to return said bills of exceptions within said time, the bills of exceptions shall be signed by the court, as originally prepared by the appellant, or his counsel. If the said appellee, or his counsel, shall return the said bills of exceptions to the appellant, or his counsel, with his amendments or additions, as heretofore provided, the said bills of exceptions with such amendments or additions shall forthwith be presented to the judge before whom the said case was tried, who shall settle the same within five days thereafter." Acts of 1916, chapter 625.

In this appeal there is no order of court extending the time for the signing of the bills of exceptions, and the appellant protested their being signed on the ground that it was too late, so if the appellant is to obtain the benefit of this enlarged statutory period in which to have its bills of exceptions signed, it is manifest that the conditions required by the law must have existed, and that the day of the signing must be within the time granted,

First. The language of the enactment is precise and clear that the limit of the extension is "until ten days before the period within which it is required that the record shall be transmitted to the Court of Appeals," *supra.* The period for this transmission is *within* three months from the time of the appeal prayed. Code, art. 5, sec. 33. The appeal was taken on February 25th, and the end of the period for the transmission of the record was on May 25th. (a) The record was duly filed in this Court on May 22nd. "Until ten days before" the 25th of May is, therefore, the limit of time for the signing of the bills of exceptions. The word "until" is usually a word of inclusion, and so the language of the statute is not gratified unless ten days are counted

from, and exclusive of, the last day of the period for the filing of the record in this Court, and the tenth or final day of the series is taken as the last day on which the bills of exceptions may be signed under the statute. This construction is in harmony with the letter and the spirit of the law and conforms to the precedents of this Court and to the now well established rule that where a particular time is given, from a certain date, within which an act is to be done, the day of the date is to be excluded, but not both terminal days, unless this be clearly indicated. (b) Applying the statute as thus interpreted, the limit fixed for the signing of the bills of exceptions was May 15th, or until ten days before May 25th. The bills of exceptions were not signed until May 16th, which was too late under the act. (a) *Balto. & O. R. R. Co.* v. *Gilmor,* 125 Md. 610, 618; *Horseman* v. *Furbush,* 124 Md. 581, 582, 583; (b) *Gottlieb* v. *Fred W. Wolf Co.,* 75 Md. 126, 131-133; *Walsh, Trustee,* v. *Boyle,* 30 Md. 262, 266-7; *Calvert* v. *Williams,* 34 Md. 672, 674; *Trustees of German Lutheran Church* v. *Heise & Co.,* 44 Md. 453, 476; *Meyer* v. *Steuart,* 48 Md. 423, 426; *Steuart* v. *Meyer,* 54 Md. 454, 463-465; *Graham* v. *Wellington,* 121 Md. 656, 660; *Parker* v. *Brattan,* 120 Md. 428, 433; *Sutherland, Statutory Construction,* sec. 112; *Goldsmiths' Co.* v. *West Metropolitan Railway* (1904), 1 K. B. 1, at p. 5.

The coincidence that May 25 fell on Sunday was advanced as a reason for the continuance of the period, within which the record had to be filed, until Monday, May 26th, which would have made the signing of the exceptions in time. This contention is answered by *American Tobacco Co.* v. *Strickling,* 88 Md. 500, 510, where the Court said. "It will not be out of place and may prevent further trouble to add that if the thirty days expire on Sunday, it should still be counted, and the next day should not be allowed, as we can see no valid reason for excluding the last Sunday and including all the others. The general rule, subject to but few exceptions, is that statutory time, if over seven days, cannot be extended

because the last day falls on Sunday." *Yerkes* v. *Board of Supervisors,* 140 Md. 455, 463.

Second.  The act stipulated, in the form of a proviso, that the bills of exceptions be submitted to the appellee or his counsel not less than thirty days prior to the time that the record must be filed in the Court of Appeals for the purpose of amendments or additions to the bills of exceptions.

If effect be given to this specific language, not less than thirty days prior to the time, must mean thirty clear days, exclusive of both terminal days. *Supra,* and Endlich on the Interpretation of Statutes, sec. 391. Hence the appellant should have submitted the bills of exceptions to the appellee not later than April 24th. The submission was not made until April 25th, which was too late.

However, this and the subsequent provisions of the enactment have been held to be directory and not mandatory, and their non-observance would not affect the consideration of the exceptions on appeal, if the bills of exceptions had been actually signed in time. *Wegefarth* v. *Weissner,* 132 Md. 595, 602; *Middendorf, Williams & Co.* v. *Milburn Co.,* 137 Md. 583, 593-594.

Third.  As the exceptions were not signed within the statutory period allowed, or within any extension of the time under an order of court, the appeal would have to be dismissed, unless the signing was done by consent of the appellee, or, what is equivalent, under such circumstances as to prevent the appellee from denying the consent. It is upon the ground of estoppel that the appellant rests her right to be heard.

The bills of exceptions were drawn by the appellant, and then were submitted to appellee's counsel, who examined them, suggested numerous changes and returned them, with their proposed alterations. The appellant then rewrote the exceptions in accordance with the suggestions of the appellee, and had them prepared by May 13th, which left only two days for the bills of exceptions to be signed. The trial judge could not sign, as he was no longer a member of the Supreme

Bench of Baltimore City, but, by the Acts of 1922, chapter
418, any member of the court may allow and sign the bills
of exceptions, if the testimony be taken in stenographic
notes or if he be satisfied by any other means that he can
allow true bills of exceptions. If the judge, however, is for
any reason satisfied that he cannot allow and sign true bills of
exceptions, he may, in his discretion, grant a new trial to the
proponent of the bills of exception.

The counsel for appellant did not ask the court for an
order to extend the time for the signing of the exceptions, as
he had the right to do under the decision in *United Railways
Co.* v. *Dean*, 117 Md. 686, 704, 705. Instead of this he
called the office of Mr. Jacob S. New, of counsel for appellee,
and was informed that he was out of town, and left word for
him to call up by telephone upon his return. Mr. New did
not call appellant's counsel, who was informed on May 14th,
after inquiry, that Mr. New was not in, but would call upon
his return. Not receiving any message from Mr. New, the
counsel for the appellant learned on May 15th that Mr. New
was engaged in the trial of a case in the Court of Common
Pleas, and when Mr. Bartlett went to the trial table Mr. New
promised to take up the matter of the exceptions with him
in the clerk's office after two o'clock of that day, and Mr.
Bartlett was there at two o'clock, but Mr. New was continu-
ously engaged at the trial table until half past four o'clock,
when it was found that the office of the clerk of the Superior
Court, where this case was tried, "was closed, the door locked,
the clerks and judges of that court had gone for the day."
The bills of exceptions had been modified so as to conform
to Mr. New's suggestions. It was the last day on which the
bills could be signed, unless the court that same day had
extended the time. If counsel for the appellee had intended
to insist upon the requirement that the bills of exceptions
would have to be signed on May 15th or not at all, he should
then have spoken. If he had made his position known, the
appellant's counsel could have sought a judge and presented
the bills of exceptions in accordance with the statute, and

have secured either his signature, a new trial, or an extension of time for the further consideration of the bills of exceptions by the court, in conjunction with counsel for the parties. Counsel for the appellee did not intimate that the time was about to expire, and that he could not consent to the exceptions being signed after that day. Instead, in response to the insistence of counsel for appellant, Mr. New made a positive engagement to meet him in the clerk's office the next morning for the purpose of having the bills of exceptions made ready for the hand of the court. By his silence, and by this agreement to meet counsel on May 16th, so as to have the exceptions signed on that day through his co-operation, the counsel for appellant naturally and reasonably believed as a fact that the attorney for the appellee had consented to the signing of the bills of exceptions on the following day, and thereby the attorney for appellee induced a change in position of the appellant to her prejudice, and the appellee is now estopped from asserting that the signature of the judge to the bills of exceptions was not subscribed on May 16th with appellee's full consent. It is true that the record shows that counsel for the appellee protested the signing of the bills of exceptions on May 16th, but this was not until he had kept his appointment for May 16th, until he had suggested additional modifications of the bills of exceptions, which were all agreed to and made, until he had made a careful examination and verification of the bills of exceptions and had found them correct, until he had said they were in proper shape for the formality of signing by the judge, and until it was too late for the appellant to assume her status of the preceding day. The motion will be denied. *Kelly* v. *Huber Baking Co.;* 145 Md. 321, 326-328; *Bastable* v. *Bastable,* 144 Md. 213, 215-217.

For the reasons given the motion to dismiss this appeal will be refused, and the judgment below will be reversed for error in granting appellee's first prayer, and in the ruling on the second bill of exceptions.

> *Judgment reversed and new trial awarded, with costs to the appellant.*